UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHY R. SANCHEZ, individually and as dependent administrator of, and on behalf of, the ESTATE OF ELI GAUNA JR. and ELI GAUNA, JR.'s heirs-at-law, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| BELL COUNTY, TEXAS; CORRECTIONAL HEALTHCARE COMPANIES, LLC f/k/a CORRECTIONAL HEALTHCARE COMPANIES, INC.; and NATALEE G. OLIVER, | § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **This is a case of a tragic pre-trial prisoner suicide resulting from violation of constitutional rights. The Defendant social worker knew of Eli's suicidal tendencies and, nevertheless, disregarded the risk and put Eli into Bell County's general jail population. Not surprisingly, Eli hung himself with a sheet in his cell. Defendants' deliberate indifference and objective unreasonableness caused Eli Gauna's death.**



Table of Contents

I.      Introductory Allegations ................................................................ 4

        A.      Parties .......................................................................... 4

        B.      Jurisdiction ..................................................................... 7

        C.      Venue ........................................................................... 7

II.     Factual Allegations ................................................................... 8

        A.      Introduction ..................................................................... 8

        B.      Eli Gauna, Jr. ................................................................... 8

        C.      Correctional Healthcare Companies, LLC's Agreement and Partnership
                with Bell County to Provide Medical and Mental Health Care Services to
                Bell County Jail Prisoners .......................................................... 9

        D.      Eli's December 2017 Arrest and Incarceration in the Bell County Jail ............... 14

                1.      Ms. Oliver's Evaluation of Eli ............................................ 16

                2.      Eli's Suicide ............................................................. 33

                3.      Bell County's Post-Death Reporting of False Information .................... 34

                4.      Jail Suicides Are a Widespread Problem .................................... 35

                        a)      Common Knowledge ................................................ 35

                        b)      Fifth Circuit's Long-Held Constitutional Standard:
                                Continuous Observation and Monitoring .................................. 36

                5.      Ms. Oliver's Background and Education ..................................... 37

        E.      *Monell* Liability of Bell County and CHC ........................................ 38

                1.      Bell County and CHC Admit That Their Policies, Practices, and/or
                        Customs, When Eli Committed Suicide, Were Insufficient .................... 38

                2.      Bell County's and CHC's Unwritten Policies, Practices, and/or
                        Customs Were Moving Forces Behind and Caused Eli's Death .............. 41

                3.      Bell County's and CHC's Policies, Practices, and/or Customs
                        Regarding Understaffing the Jail on Weekends were Moving Forces
                        Behind and Caused Eli's Death ............................................ 42

                4.      Bell County's and CHC's Policy, Practice, and/or Custom of
                        Staffing the Jail with only a Lower-Level Mental Health Worker
                        was a Moving Force Behind and Caused Eli's Death ....................... 42

                5.      Bell County's and CHC's Policy, Practice, and/or Custom of
                        Gutting Healthcare and Mental Healthcare Costs was a Moving
                        Force Behind and Caused Eli's Death ...................................... 43

III.    Causes of Action .................................................................... 45

A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ........................................... 45

B.    Cause of Action Against Natalee G. Oliver Under 42 U.S.C. § 1983 for Violation of Eli Gauna's 14th Amendment Due Process Rights to Reasonable Medical and Mental Health Care, to be Protected, and Not to Be Punished as a Pretrial Detainee ...................... 48

C.    Cause of Action Against Bell County and CHC Under 42 U.S.C. § 1983 for Violation of Eli Gauna's 14th Amendment Due Process Rights as a Pretrial Detainee to Reasonable Medical and Mental Health Care, to be Protected, and Not to be Punished ........................................ 52

D.    Causes of Action Against Bell County for Violation of Americans with Disabilities Act and Rehabilitation Act ................................................. 55

IV.    Concluding Allegations and Prayer ................................................. 57

A.    Conditions Precedent ............................................. 57

B.    Use of Documents at Trial or Pretrial Proceedings ............................................. 57

C.    Jury Demand ............................................. 57

D.    Prayer ............................................. 57

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Kathy R. Sanchez ("Ms. Sanchez") is a natural person who resides and did reside and was domiciled in Texas at all relevant times. Ms. Sanchez was Eli Gauna Jr.'s legal and biological mother. Eli Gauna Jr. is referred to herein at times as "Mr. Gauna," "Eli Gauna," and/or "Eli." Ms. Sanchez sues in her individual capacity and as the Dependent Administrator of the Estate of Eli Gauna Jr. Ms. Sanchez, when asserting claims in this lawsuit as the Dependent Administrator, does so in that capacity and on behalf of the estate (including all of Eli's heirs at law including but not limited to Ms. Sanchez and Mr. Gauna's legal and biological father, Eli Gauna, Sr.). Letters of dependent administration were issued to Ms. Sanchez on or about March 6, 2019, in Cause Number 33619, in the County Court at Law Number 1 of Bell County, Texas, in a case styled *Estate of Eli Gauna Jr., Deceased*.

2.      Defendant Bell County, Texas ("Bell County") is a Texas county. Bell County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge David Blackburn, at 101 East Central Avenue, Belton, Texas 76513, or wherever Honorable Judge Blackburn may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). Bell County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, and through its designated jail healthcare and mental healthcare provider, Correctional Healthcare Companies, LLC f/k/a Correctional

Healthcare Companies, Inc. ("CHC"), and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act).  Bell County's policies, practices, and/or customs were moving forces behind constitutional violations, and resulting damages and death, referenced and asserted in this pleading.  Bell County acted or failed to act under color of State law.  Bell County cannot delegate its constitutional duties, to provide medical care and mental health care to its prisoners, to CHC and thereby avoid liability for constitutional violations committed by CHC.  Bell County has non-delegable duties to comply with the United States Constitution regarding prisoners in its care.  Therefore, in addition and/or in the alternative to all other allegations made in this complaint, CHC, to which Bell County has entrusted, or to which it has delegated healthcare and mental health care of Bell County prisoners, and with which it has acted in such regard, is liable for actions and inactions of CHC.  In the alternative or in addition, Bell County and CHC acted and/or failed to act together, in a partnership and/or joint enterprise, or pursuant to similar legal principles, to provide care or fail to provide care to prisoners in Bell County's jails.  Thus, Bell County is liable for CHC's actions and inaction related to such purported care, and both Bell County and CHC are each liable for any policies, practices, and/or customs of the other which were moving forces behind and which caused violations and damages referenced in this pleading.

3.     Defendant Correctional Healthcare Companies, LLC f/k/a Correctional Healthcare Companies, Inc. is a Delaware limited liability company which, before conversion and/or merger, was a corporation named "Correctional Healthcare Companies, Inc."  CHC may be served with process by serving its registered agent for service of process, Corporate Creations Network Inc., at its registered office, 2425 W. Loop South #200, Houston, Texas 77027.  Such service is in accordance with Federal of Civil Procedure 4(h)(1)(A), which provides that service of process may

be made in the manner prescribed by Rule 4(e)(1) for serving an individual. Rule 4(e)(1) provides that service on an individual may be made in the manner allowed by the law of the state in which the district court in which the federal case is filed is located. Service on the registered agent for service of process is provided by Texas law. In addition, CHC may be served with process, pursuant to Rule (4)(h)(B), by delivering a copy of the summons and this complaint to an officer, or a managing or general agent, of CHC, wherever any such person may be found. CHC, through its employees, agents, representatives, and/or chief policymakers, acted and/or failed to act at all relevant times, and it is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). CHC acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations, and resulting damages and death, referenced and/or asserted in this pleading.

4.     Defendant Natalee G. Oliver ("Ms. Oliver," or "Natalee Oliver") is a natural person who resides, is domiciled, and may be served with process at 905 Erica Drive, Hewitt, Texas 76643. Ms. Oliver may be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Oliver at Ms. Oliver's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Oliver is being sued in her individual capacity, and she acted at all relevant times under color of state law. Ms. Oliver was employed by CHC at all such times and acted or failed to act in the course and scope of her duties for CHC. Ms. Oliver was also acting at the behest of, as the agent of, and in the course and scope of her duties for Bell County as a result of (1) Bell County's inability to delegate its constitutional duties to a third party; and (2) the relationship between Bell County and CHC referenced and/or described in Plaintiff's Original Complaint in this case, including but not limited to paragraph 2 in that pleading.

B.      Jurisdiction

5.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and federal statutes including but not necessarily limited to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

6.      The court has personal jurisdiction over Bell County because it is a Texas county. The court has both general jurisdiction and specific jurisdiction over CHC because it regularly conducts business in Texas and the Southern District of Texas, Houston Division, in a manner in which it would be expected to be hailed into federal court in the Houston Division of the Southern District of Texas, and moreover because its minimum contacts with the State of Texas, the Southern District of Texas, and specifically the Houston Division, are such that fundamental fairness would result in such jurisdiction.  The court has personal jurisdiction over the natural person Defendant because she resides and is domiciled in, and is a citizen of, Texas.

C.      Venue

7.      Venue is proper in the Houston Division of the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).  All Defendants are residents of Texas.  Bell County is a Texas County, and Ms. Oliver is a Texas resident, is domiciled in Texas, and is a citizen of Texas.  Further, CHC is a resident of Texas and the geographic area covered by the United States District Court for the Southern District of Texas.  CHC is subject to the court's personal jurisdiction in the Southern District of Texas, and specifically the Houston Division, pursuant to general jurisdiction and possibly, upon information and belief, specific jurisdiction. Upon information and belief, the primary office and/or principal place of business for CHC in

Texas is in Fort Bend County, and the regional manager of and for CHC has his or her primary office and primary place of business for CHC in that county.  Upon information and belief, the CHC region managed by that person encompasses not only the entire State of Texas, but also one or more other States.  Fort Bend County is within the United States District Court for the Southern District of Texas, Houston Division.  There are more than sufficient contacts with the Southern District of Texas, and specifically the Houston Division, to subject CHC to personal general jurisdiction there, if the Southern District as a whole, or in the alternative the Houston Division within the Southern District, were a separate State.

II.      Factual Allegations

    A.      Introduction

    8.      Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

    B.      Eli Gauna, Jr.

    9.      Eli was born in 1994 in Temple, Texas to Eli Gauna, Sr. and Kathy Sanchez.  He lived in Temple all of his life, and he graduated from Temple High School.  He was only 23 years old at the time of his death.

C.    Correctional Healthcare Companies, LLC's Agreement and Partnership with Bell County to Provide Medical and Mental Health Care Services to Bell County Jail Prisoners

10.    The business of providing, or in some situations unfortunately not providing, healthcare and mental healthcare to prisoners in county jails throughout the United States is big business.  There are untold millions of dollars to be made by private companies promising and/or contracting to provide such services.  CHC is no exception to the rule that such companies are in business to make a profit.

11.    CHC, as of roughly year 2012 or 2013, provided medical and/or mental health care services in 240 facilities across the United States.  In Texas, during roughly that time period, CHC provided such services to Texas jails including those in Bell County, Collin County, Ellis County, Kerr County, Lubbock County, Montgomery County, Smith County, and Wichita County.

12.    CHC provides its summary of its history in Exhibit B to the contract between it and Bell County referenced in this pleading.  CHC indicates that it consolidated other providers of offender healthcare services as it grew larger.  CHC indicates that it began in 1979, "three years after the U.S. Supreme Court ruled medical care for jail and prison inmates was not a privilege, but a constitutional right."  CHC also notes that its healthcare program must be compliant with all federal, state, county, and local laws, as well as requirements of the Americans with Disabilities Act.  Exhibit B also notes that CHC would work with Bell County to provide assistance and support to disabled inmates (presumably who fall within ADA requisites).  CHC's history is one of growing organically and acquiring other companies in the pursuit of significant profit.

13.    CHC, when it was named "Correctional Healthcare Companies, Inc.," signed a 21-page (plus attachments) contract with Bell County in January 2014.  That contract was entitled "Agreement for Inmate and Juvenile Health Care Services at Bell County, Texas."  The title also indicated that the contract was effective January 12, 2014.  The term of the initial agreement was

for three years, ending January 12, 2017 at 11:59 p.m.  Upon information and belief, that agreement was extended for several years and was in effect until January 2019.

14.     One of the contractual recitals noted that Bell County "and the duly elected Sheriff . . . are charged by law with the responsibility for providing access to medical care for inmates of the Bell County jail . . . ."  Another recital read in part, "CHC is in the business of administering correctional health care services and desires to administer such services to inmates and detainees at the [Bell County jail] . . . and to administer such services under the terms and conditions" set forth in the contract.  Thus, Bell County acknowledged in writing, if such were necessary, that it had imposed on it legal obligations to provide care to prisoners in its jail.  The contract also provided that CHC's chief medical officer would be a physician selected by CHC and approved by Bell County.  Further, that chief medical officer would be the "primary decision maker for certain medical matters" pursuant to the contract.  Thus, Bell County retained control over selection of that person.

15.     The contract also provided that CHC would administer and/or arrange for healthcare services including:

- providing initial health screening during booking procedures for all new prisoners at the jail, including behavior observations - including state of consciousness, mental status, and whether the prisoner is under the influence of drugs and/or alcohol; and

- referral by CHC of the prisoner for special housing, emergency health services, or additional medical specialties

Further, Bell County agreed that CHC would arrange for on-site mental health services for prisoners, including intake; medication evaluation/prescriptions; and mental health evaluation, referral, crisis management, suicide intervention, and individual therapy.  Further, if a prisoner needs off-site or inpatient mental health services, the contract provided that Bell County would pay for such services.

16.     The contract also provided that CHC "shall provide or arrange for the provision of medical, mental health, and support personnel . . . necessary to render the health care services" contemplated by Attachment A to the agreement.   Attachment A, for the Bell County Annex/Central Jail, contrary to staffing for the Bell County Loop Jail, had no health services administrator, medical director, mid-level providers, registered nurses, licensed vocational nurses for booking-intake, certified medical assistance, medical records clerks, psychiatrists, or mental health professionals.  However, even though the Bell County Loop Jail had such persons listed on the staffing matrix, on weekends, the matrix provided at that jail for no health services administrator, medical director, mid-level providers, medical records clerks, and/or psychiatrists.

17.     Further, that matrix, for that jail, provided that, on weekends, a purported "mental health professional" would be present for ten hours during the days (but not at night or during evenings), as contrasted with 16 hours during the day on Monday, Wednesday, and Friday and 12 hours during the day on Tuesday and Thursday.  Thus, Bell County and CHC clearly agreed to and, upon information and belief, did understaff the jail on weekends.  However, as set forth elsewhere in this pleading, constitutional standards apply just the same on weekends as they do on weekdays.

18.     Thus, this was a deliberate decision to be indifferent to prisoners with health care and mental health care needs, such as Eli, who were in a Bell County jail on a weekend.  This was particularly important with regard to Eli, since the relevant events referenced in this pleading, and the suicide attempt resulting in Eli's death, occurred on a national holiday weekend.

19.     As to staffing, the contract contained agreement that increases or decreases in staffing requirements could be agreed to by the Bell County Sheriff and CHC.  Further, such agreements would be in writing.  This provision, and others in the contract, show the joint

responsibility by and between Bell County and CHC for provision of health care and mental health care to Bell County prisoners.

20.     Further, the contract provided that the health services administrator and the chief medical officer "shall confer" regularly with the Bell County sheriff, and director of the Bell County detention center, as well as other departmental staff, as appropriate, to review any problems, reports, or other issues.  Further, CHC was not allowed, pursuant to the contract, to make any healthcare staff changes without prior notice to and written approval of the Bell County sheriff, or detention center director.  Healthcare staff of CHC working at Bell County jails was subject, pursuant to the contract, to final approval by the Bell County sheriff and/or the County.  Further, the Bell County sheriff and/or the County could withhold approval for any reason, including but not limited to reasons relating to a person's background and/or security issues.

21.     The contract also provided that CHC would conduct ongoing health and mental health education and training programs for County sheriffs, deputies, and jailers.  The need for such education and training would be mutually established by Bell County and CHC.  CHC even conducted mental health evaluations, pursuant to the contract, for new Bell County employees.

22.     CHC was further obligated pursuant to the contract to submit monthly reports to the Bell County Sheriff and director of the Bell County detention center.  Quarterly, CHC's health services administrator, regional representative, and any other management representatives required would meet with the Sheriff and/or detention center director or their designee.  Concerning procedures in the jails and any proposed changes regarding health-related procedures or other matters which both parties deemed necessary.  CHC was contractually obligated to maintain, cause, or require maintenance of "complete and accurate electronic medical records" for every prisoner who received healthcare services.  CHC was contractually obligated to conduct an

annual review of all medical healthcare policies with the Bell County Sheriff and the Bell County

Detention Center director.

23.     CHC, contractually, along with its healthcare staff, employees, agents, and

subcontractors, "Shall operate within the requirements of" Bell County's, the Bell County

Sheriff's, and/or the detention center's posted policies and procedures regarding the provision of

medical services.  Further, if Bell County, its sheriff, and/or its detention center wanted to modify

and policies and procedures related to healthcare and/or mental health care, they could do so and

provide modified policies and/or procedures to CHC.  CHC, it healthcare staff, employees, agents,

and/or subcontractors had to then, contractually, operate within the requirements of the modified

policies and procedures made available to CHC.  In Exhibit B, on page 95 of the contract (counting

not only the 21-page body but all attachments), the relationship between the County and CHC is

further described.

> The County shall have the unfettered right to monitor [CHC's] work in every
> respect.  In this regard, [CHC] shall provide its full cooperation, and ensure the
> cooperation of its employees [and] agents.  Further, [CHC] shall make available for
> inspection and/or copying when requested, original time sheets, invoices, charge
> slips, credentialing statements, continuing education and training records, and any
> other data, records and accounts relating to [CHC's] work and performance under
> the contract.  In the event [CHC] does not hold such material in its original form, a
> true copy shall be provided.

Thus, the provision of services was clearly a joint effort by and between Bell County and CHC.

In the alternative or in addition, Bell County also delegated to CHC the provision of certain

medical care and mental health care services to Bell County prisoners.  In doing so, pursuant to

controlling authority, Bell County still retained constitutional duties to provide appropriate

medical care and mental health care to its prisoners, such that it is liable for any actions and/or

inaction of CHC.

D.    Eli's December 2017 Arrest and Incarceration in the Bell County Jail

24.    Eli was arrested and taken to a Bell County jail on Saturday, December 30, 2017.

A document from Eli's medical records with the Bell County jail contains an entry reading:

> IM state he tried hanging himself in July 2017 and was hospitalized at S&W STC1.
> He is requesting at this time to be housed by himself and states he cannot be around
> others.  He states he was held at gunpoint and forced to rob someone or else the
> people told him they were going to run up in his house and harm his family.  Please
> evaluate.

Upon information and belief, this entry was made by licensed vocational nurse ("LVN") Japrynge

Cunningham.  Upon information and belief, LVN Cunningham conducted the initial intake of Eli

on December 30, 2017.  Further, upon information and belief, LVN Cunningham correctly placed

a suicide watch on Eli until Eli could be further evaluated.   LVN Cunningham correctly

determined, based upon Eli's intake form and prior medical and mental health history referenced

in this pleading, that Eli needed to be placed on a suicide watch and not released into the general

jail population.

25.    Upon information and belief, at the conclusion of LVN Cunningham's evaluation

of Eli, it was determined that magistrate notification was appropriate.  The notification form is set

forth below.

confined person suspected of
mental illness or intellectual
developmental disability
Related
Statue/Code/Standard:
Texas CCP Art. 16.22



## MAGISTRATE NOTIFICATION

NAME: Gauna, Eli _____ ▮▮▮▮▮▮▮ 253059

CAUSE# / CASE#                          OFFENSE

M /F: TPD17010184 _____ Burg of Building _____

M / F: _____ _____

M / F: _____ _____

M / F: _____ _____

Officer Signature: Cpl Roach _____ Date: 12/30/17

X___ Magistrate notification is being generated in order to inform the courts that a person might possibly have a mental illness or intellectual disability based upon confirmed CCQ match, self-reporting or other reliable source.

_____ Offenders recent institutional behavior has risen to the level that reasonable cause now exists to believe that the offender has a current mental illness or is a person with mental impairment. Attached is a brief synopsis of behavior.

X___ Other: Lost job/significant other/custody children; difficulty learning; gained/lost weight; attempted suicide in past; feeling hopeless; signs of recent self-harm

COMMENTS: _____

DATE OF MENTAL HEALTH ASSESSMENT: 12/30/17   DATE FAXED: 12/30/17

COURT NOTIFICATION

X___ Fancy.Jezek@bellcounty.texas.gov
_____ Rebecca.DePew@bellcounty.texas.gov
_____ Fort Hood -254-288-3370
_____ Kerr County- 830-895-2705
_____ Hay County

N

26.     Upon information and belief, the next person to evaluate Eli was Ms. Oliver. Upon information and belief, all medical information referenced in this pleading was available to, and reviewed by, Ms. Oliver when she determined not to keep Eli on suicide watch on December 30, 2017 but instead to place him into the general jail population (contrary to his request to be segregated to assist with his mental health issues).

27.     Moreover, upon information and belief, when Ms. Oliver reviewed Eli's medical records before making such a determination, she was able to review, and did review, that a magistrate had been notified twice before when Eli was previously admitted to a Bell County jail on or about October 19, 2017 and August 23, 2017.  Magistrate notification is required by Texas law when, in general, a prisoner has or is suspected of having significant mental health and/or self-harm issues (including potentially other issues).    Thus, Ms. Oliver possessed information indicating that Eli's responses to mental/developmental/suicide issues at intake were sufficient that a magistrate had to be notified three times, for three separate admissions to the jail, from August 2017 through the end of December of the same year.  This covered only a little more than a four-month period.  Such multiple magistrate notifications, and continual issues with Eli, was more than sufficient information to notify Ms. Oliver that she needed to take action.  Instead, she released Eli into the general population and was deliberately indifferent to his obvious mental health needs.

1.     Ms. Oliver's Evaluation of Eli

28.     As shown above, this was not the first time that Eli had been in the Bell County jail.  During one prior incarceration, on October 19, 2017, a Screening Form for Suicide and Medical/Mental/Developmental Impairments for Eli was completed.  There was clear, unabashed information on that form that would lead not only someone such as Ms. Oliver to the inescapable conclusion that there is a substantial likelihood, and a virtual certainty, that Eli would attempt to kill himself if left in a situation in which he was able to do so, but also any layperson.  That form is shown below.

**Screening Form for Suicide and Medical/Mental/Developmental Impairments**

| County: Bell | Date and Time: 10-19-17  0647 | Name of Screening Officer: Johnson |
|---|---|---|

Inmate's Name: Gauna, Eli    Gender: M    If female, pregnant? Yes ☐ No ☐ Unknown ☐

Serious injury/hospitalization in last 90 days? Yes ☑ No ☐ If yes, describe: Cut hand, hospital today

Currently taking any prescription medications? Yes ☐ No ☑ If yes, what:

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☑ No ☐ If yes, describe: ☑ Polar

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐ No ☑ If yes, describe:

Do you have a history of drug/alcohol abuse?  If yes, note substance and when last used    No

*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe    No

*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐ No ☑ If yes, describe:

*If yes, Notify Medical or Supervisor Immediately

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| *IF YES TO 1a, 1b,1c, or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | ✓ | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | ✓ | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | ✓ | "it's a high risk" |
| 1c. Have you ever attempted suicide? If so, when and how? | ✓ | | today, strangulation |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | ✓ | |
| *IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted* | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | ✓ | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | ✓ | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | ✓ | | depressed |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | ✓ | | Nightmares Always |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | ✓ | | Anybody, doesn't trust people |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | ✓ | 200 |
| 8. Have you ever received services for emotional or mental health problems? | ✓ | | yes  MHMR Scott |
| 9. Have you been in a hospital for emotional/mental health in the last year? | ✓ | | Attempted suicide 5 mo. ago |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | ✓ | | Bipolar Depression |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | ✓ | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | ✓ | |
| *IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | ✓ | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | ✓ | | See back |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | ✓ | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | ✓ | |

Additional Comments (Note CCQ Match here):    No Match

| Magistrate Notification Date and Time: 10.19.17 Electronic or Written (Circle) | Mental Health Notification Date and Time: 10/19/17 @ 0907 | Medical Notification Date and Time: |
|---|---|---|

Supervisor Signature, Date and Time:  Cpl Roach  10/19/17  0702

29.    The form indicates that Eli had a cut hand and had gone to the hospital that day.

The form also indicates that Eli was Bipolar.  All reasonable jailers, and all mental health personnel

working in Texas jails, such as Ms. Oliver, know that a person who is Bipolar, when combined with other factors such as those in Eli's life and/or medical and mental health history, has a significantly-increased likelihood of being suicidal.

30.     One of the questions was, "Are you thinking of killing or injuring yourself today? If so, how?" Neither the "Yes" nor "No" box was checked, but the comments portion read "it's a high risk."

31.     Another question on the form read, "Have you ever attempted suicide?  If so, when and how?"  The "Yes" box was checked, and the comments portion next to the box read "today, strangulation."

32.     Another question read, "Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things?"  The "Yes" box was checked, and the comment read "depressed."

33.     Another question read, "Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past?"  The "Yes" box was checked, and the comment portion read, "Nightmares Always."

34.     Another question on the form read, "Are you worried someone might hurt or kill you?"  The "Yes" box was checked, and the comment portion read, "Anybody. doesn't trust people."

35.     In response to the question "Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest?"  The "No" box was checked, but the comment read, "all."

36.     Another question on the form read, "Have you ever received services for emotional or mental health problems?"  The "Yes" box was checked, and the comment read, "Yes, MHMR Scott & White."

37.     Another question on the form read, "Have you been in a hospital for emotional/mental health in the last year?"  The "Yes" box was checked, and the comment read, "Attempted suicide 5 mo. ago."  Thus, in addition to the suicide which Eli attempted on October 19, 2017, Bell County, and the person completing the form at the time, knew that Eli had also attempted suicide several months before.  This information, plus all the information mentioned above and below on that form, clearly indicated to anyone reading it that Eli was more than at a substantial risk of committing suicide.  There was a virtual certainty that Eli would commit suicide if appropriate action were not taken.

38.     When asked what Eli's diagnosis was, related to his receiving services for emotional or mental health problems and/or being hospitalized for an emotional/mental health issue in the prior year, Eli responded, as recorded in the comments, "Bipolar Depression."  Alarm bells should have been going off in the mind of the person completing the form, and any other person reviewing the form, with the information referenced here and above.  All reasonable jailers and mental health personnel in jails in Texas know, pursuant to training, that an inmate with these issues, especially one who has been diagnosed as being Bipolar and having depression, presents a virtual certainty of committing suicide.  This was true for Ms. Oliver as well.

39.     The "Yes" box was checked in response to the question, "Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)?"  The comments next to that response read, "See back."  However, the back of the form was not provided.  Nevertheless, upon information and belief, Ms. Oliver was able to review all information in the above-described form, as well as what was on the back, when she interacted with and completed intake of Eli in late December 2017 as referenced in this pleading.

40.     The October 19, 2017 form concluded with a section indicating that a magistrate was notified due to Eli's significant risk of self-harm.  The screening officer listed on the form was

"Johnson," and the supervisor signing the form was Corporal Tiffany Roach.  The magistrate notification was required by law due to a "Yes" answer on the form.  All of the above-referenced information on the form would lead even a layperson to the conclusion that there was a substantial likelihood, and a virtual certainty, that Eli would attempt to kill himself if he were put into a situation in which he was able to do so.

41.     The same Screening Form for Suicide and Medical/Mental/Developmental Impairments form, which is promulgated by the Texas Commission on Jail Standards for Texas county jails, was completed when Eli was admitted to the Bell County jail on December 30, 2017.  That completed form is depicted below.

**Screening Form for Suicide and Medical/Mental/Developmental Impairments**

| County: **BELL** | Date and Time: 12-30-17 0715 | Name of Screening Officer: Mungia |
|---|---|---|

| Inmate's Name: Gauna, Eli | Gender: M | If female, pregnant? Yes ☐ No ☐ Unknown ☐ |
|---|---|---|

Serious injury/hospitalization in last 90 days? Yes ☐ No ☒ If yes, describe:

Currently taking any prescription medications? Yes ☒ No ☐ If yes, what: ADHD, bipolar

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐ No ☒ If yes, describe:

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐ No ☒ If yes, describe:

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used
No

*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe
NO

*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐ No ☒ If yes, describe:

*If yes, Notify Medical or Supervisor Immediately

Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| **IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | X | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | X | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | X | | yea MAybe not sure |
| 1c. Have you ever attempted suicide? If so, when and how? | X | | a couple months ago hanging |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | X | |
| **IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted** | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | X | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | X | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | X | X | All the time |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | X | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | | X | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | X | |
| 8. Have you ever received services for emotional or mental health problems? | X | | MHMR |
| 9. Have you been in a hospital for emotional/mental health in the last year? | X | | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | X | | ADHD, bipolar |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | X | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | X | |
| **IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | X | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | | X | |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | X | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | X | |

Additional Comments (Note CCQ Match here): _____ MATCH   X NO MATCH

| Magistrate Notification | Mental Health Notification | Medical Notification |
|---|---|---|
| Date and Time: 12.30.17 | Date and Time: by 12/30/17 0731 | Date and Time: |
| Electronic or Written (Circle) | | |

| Supervisor Signature, Date and Time: by 12/30/17 0731 |
|---|

42.     The December 30, 2017 form had much of the same information which the October 19, 2017 form had on it.  Upon information and belief, at the time Ms. Oliver interacted with Eli as referenced below (and possibly elsewhere herein), she was able to review both the October 19, 2017 completed form and the December 30, 2017 completed form.

43.     The December 30, 2017 form, taken together with other documents received in response to Public Information Act requests, appears to indicate that the screening officer was Derek Mungia.  The form is also signed by a supervisor with the last name of Ray.  The form indicates that Eli was taking medication for being ADHD and Bipolar.  These two maladies are warning signs, when taken together with Eli's other mental health issues referenced in both forms, of a person's propensity for suicide and/or other erratic behavior.  The form contained a question which read, "Are you thinking of killing or injuring yourself today?  If so, how?"  The "Yes" box was checked, and the comment next to it read, "Yea [sic] maybe not sure."

44.     Another question on the form read, "Have you ever attempted suicide?  If so, when and how?"  The "Yes" box was checked, and Eli indicated that he had done so "a couple months ago hanging."

45.     There was also a question on the form which read, "Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things?"  The "Yes" box was checked, and the comment read, "All the time."

46.     The "Yes" boxes where checked in response to questions about whether Eli had ever received services for emotional and mental health problems, and/or been in the hospital for emotional/mental health issues in the last year.  The comment section to the first question read "MHMR."  As to the diagnosis for such issues, the comment section read "ADHD, bipolar."

47.     Warning bells should have been going off, loudly and continuously, in Ms. Oliver's mind when reviewing these documents, as she did, upon information and belief, when deciding

whether to release Eli into the general jail population or keep him on suicide watch as LVN Cunningham had done prior to contacting Ms. Oliver for such a determination.  Ms. Oliver disregarded those warning bells, and more specifically and importantly disregarded all the information referenced thus far in this pleading and decided to place Eli into the general jail population.  This was deliberate indifference to Eli's serious mental health needs, resulting in a substantial likelihood, and near certainty, that he would kill himself if provided the means and opportunity.  Putting Eli into the general jail population provided both.  Upon information and belief, Ms. Oliver drew the inference of this substantial likelihood, and near certainty, of Eli's death.

48.     Upon information and belief, Ms. Oliver completed a Bell – Mental Health Evaluation for Eli before deciding to release him into the general jail population with no precautions as to what would be available to him, physically, to be able commit suicide.

CorEMR - ELI GAUNA :: BELL- Mental Health Evaluation | v5.0.0                                     Page 1 of 1

**BELL- Mental Health Evaluation**

ELI GAUNA
#2017-00011331

JMS ID: 1190101
SSN:
DOB:
Age: 23
Agency: TX0140000

Location: [OUT]
Interviewer: Oliver LCSW, Natalee (12/30/2017 09:36)

| | | |
|---|---|---|
| | Diagnosis | Bipolar, ADHD per IM |
| | Current Psychotropic Medications | on Abilify through S&W ("all my life") |
| | Active Suicidal Ideation | "all the time", always have intermittent SI, "it always crosses my mind", "there is always a plan", no intent "at the moment", says being around people makes it worse |
| | History of suicide attempts | 7 SA, w/ last attempt 10/18/17 hanging self and went to S&W (was not on Abilify)<br>denies family hx of SA<br>denies prior SW placement in jail |
| | Alcohol abuse | not in years |
| | Other drug abuse | smoked weed yesterday |
| | LEGAL HISTORY | see records<br>burglary on 48 hold/screening |
| | DIAGNOSTIC IMPRESSION | "very, very depressed", anxious "non-stop", cooperative |
| S. | Subjective | IM stated he is single, but has a significant other. IM denies any kids and that he lives with his aunt. IM stated he has some support. IM stated he is not working. |
| O. | Objective | A&Ox4. Appearance was appropriate. Speech was clear. Eye contact was good. IM stated he has AH "all the time", last time had AH was Christmas "and put me to where I physically hurt myself." Denies HI/VH and when asked if SI, "all the time", always have intermittent SI, "it always crosses my mind", "there is always a plan", no intent "at the moment", says being around people makes it worse. Memory was intact. Insight, judgment and impulse control were fair. |
| A. | Assessment | Completed Columbia SSRS and Collaborative Safety plan. IM asked for the infirmary and educated him that it is for crises mgt, short-term stabilization. Informed IM he can not be in SEG cell b/c of SA hx. Discussed IM going to central b/c it's calmer/quieter and less people. Discussed mandatory f/u visits. Encouraged medication compliance, staying active, going to rec, and keeping open communication of mood state if it declines. Talked to classification and there is room at central. No other concerns at this time. |
| P. | Plan | 1. housing at central<br>2. MHP to f/u PRN<br>3. medical to f/u PRN |
| | Staff Signature | Natalee Oliver, LCSW, MHP | 12/30/2017 00:00 |

49.     Ms. Oliver noted some of her observations, and things she learned, on the single-page form. As Eli's diagnosis, she indicated Bipolar and ADHD. Ms. Oliver also listed that Eli, as to current psychotropic medications, was taking Abilify through Scott & White. She also indicated that Eli said, regarding that medication, "all my life."

50.     In the section entitled "Active Suicidal Ideation," Ms. Oliver typed the following responses (which were the substance of Eli's responses regarding suicidal ideation):

    •   all the time

- always have intermittent suicidal ideation

- it always crosses my mind

- there is always a plan

- no intent "at the moment"

- says being around people makes it worse

51.     Regarding a history of suicide attempts, Ms. Oliver noted that she was told by Eli that he had attempted to commit suicide seven (7) times, the last of which only being a little more than two months before the current December 30, 2017 incarceration.  Eli told Ms. Oliver that he had attempted suicide on October 18, 2017 – by hanging himself.  Not surprisingly, Ms. Oliver's diagnostic impression was that Eli was "very, very depressed," and anxious "non-stop."

52.     Beyond these very clear signs that Eli, if allowed to do so, would kill himself, Ms. Oliver was given other clear and unambiguous indications that Eli had significant mental health issues which would cause him to harm himself.  Ms. Oliver indicated on the form that Eli had auditory hallucinations "all the time."  She also learned from Eli that the last time he had such an auditory hallucination was Christmas (only five days before).  Regarding that occurrence, Eli said that it "put me to where I physically hurt myself."  Not surprisingly, Ms. Oliver's objective impression of Eli included that his judgment and impulse control were only "fair."  It does not take a LCSW to determine that Eli was going to kill himself in the Bell County jail if allowed the opportunity.  This was clear to Ms. Oliver at this point.  Nevertheless, she disregarded this information and was deliberately indifferent to Eli's significant mental health needs and inclination to kill himself when she decided to put him into the general population she did so contrary to his request to be isolated, and knowing that the area in which he would be housed would contain things with which he could kill himself (including a bed sheet).  She thus sealed his fate.

53.     Ms. Oliver's form moreover indicates that, despite Eli's statement that being around a lot of people made his mental health issues worse, he could not be placed into a segregated cell. Upon information and belief, she provided false information to Eli.  Section 5.08 of Bell County Jail Operational Plans, relating to mental disability/suicide, addresses housing for a prisoner such as Eli.  Subsection (A) reads:

> Inmates who have attempted suicide or are undergoing a psychotic episode and deemed a risk to themselves or others shall be placed in a Mental Health cell, located in the jail infirmary for close observation purposes, under the authority of the jail administrator, shift supervisor or the mental/medical health care provider on site.
>
> 1.     Inmates placed in special housing for observation shall only be provided with a mattress, suicide blanket and a suicide prevention gown. Standard issued or purchased items that could cause harm are prohibited while in special housing.
>
> 2.     In extreme cases, when the inmate poses a threat to himself or others, clothing may be removed with the approval of the jail administrator or his designee. If so ordered this action must be reviewed and documented every 24 hours.

Thus, the policy required Ms. Oliver – due to Eli's previous suicide attempts – to place him into a mental health cell located in the jail infirmary for close observation purposes (as Eli had actually requested).  Thus, Ms. Oliver refused to accommodate Eli's mental health issue by fulfilling his request and by complying with Bell County policy.

54.     Notably, if Eli had been placed into that cell, if in fact the policy is truthfully stated and reflects the actual custom and practice of Bell County and CHC, Eli would have been provided suicide prevention materials (as opposed to materials such as the bed sheet which he used to kill himself).  Ms. Oliver then documented that she spoke with classification, and determined that there was room at the central Bell County jail (for Eli to be placed into general population contrary to his expressed desire and County policy).  It was this decision, among potentially others, that led to and caused Eli's untimely death.

55.     Interestingly, Ms. Oliver indicates in her evaluation form that she had completed the Columbia SSRS and Collaborative Safety plan.  However, when making Public Information Act requests prior to the filing of this lawsuit, no agency, and Bell County, upon information and belief, produced a copy of a form indicating that such was actually completed.  Upon information and belief, either Ms. Oliver did not complete the form as indicated, or the form was purposefully destroyed due to having significantly–damning information related to Eli's death, Bell County provided to the Texas Commission on Jail Standards, after Eli's death, only a copy of such a blank 3-page form:

| ▲CCS CORRECT CARE SOLUTIONS | Suicide Watch Initial Assessment | Patient Name (Last, First, MI): |
|---|---|---|
| Date of Birth: | Status: ☐ Adult ☐Juvenile | Patient ID No: | Date: |

## ☐ Check here if patient refuses to answer

### COLUMBIA-SUICIDE SEVERITY RATING SCALE *Screen Version - Recent*

| SUICIDE IDEATION DEFINITIONS AND PROMPTS | Past month | |
|---|---|---|
| **Ask questions that are bolded and underlined.** | YES | NO |
| Ask Questions 1 and 2 | | |
| 1) **Wish to be Dead:**<br>Person endorses thoughts about a wish to be dead or not alive anymore, or wish to fall asleep and not wake up.<br>**Have you wished you were dead or wished you could go to sleep and not wake up?** | | |
| 2) **Suicidal Thoughts:**<br>General non-specific thoughts of wanting to end one's life/commit suicide, "I've thought about killing myself" without general thoughts of ways to kill oneself/associated methods, intent, or plan.<br>**Have you actually had any thoughts of killing yourself?** | | |
| **If YES to 2, ask questions 3, 4, 5, and 6. If NO to 2, go directly to question 6.** | | |
| 3) **Suicidal Thoughts with Method (without Specific Plan or Intent to Act):**<br>Person endorses thoughts of suicide and has thought of a least one method during the assessment period. This is different than a specific plan with time, place or method details worked out. "I thought about taking an overdose but I never made a specific plan as to when where or how I would actually do it....and I would never go through with it."<br>**Have you been thinking about how you might kill yourself?** | | |
| 4) **Suicidal Intent (without Specific Plan):**<br>Active suicidal thoughts of killing oneself and patient reports having some intent to act on such thoughts, as opposed to "I have the thoughts but I definitely will not do anything about them."<br>**Have you had these thoughts and had some intention of acting on them?** | | |
| 5) **Suicide Intent with Specific Plan:**<br>Thoughts of killing oneself with details of plan fully or partially worked out and person has some intent to carry it out.<br>**Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?** | | |
| 6) **Suicide Behavior Question:**<br>**Have you ever done anything, started to do anything, or prepared to do anything to end your life?**<br>Examples: Collected pills, obtained a gun, gave away valuables, wrote a will or suicide note, took out pills but didn't swallow any, held a gun but changed your mind or it was grabbed from your hand, went to the roof but didn't jump; or actually took pills, tried to shoot yourself, cut yourself, tried to hang yourself, etc.<br>**If YES, ask: How long ago did you do any of these?**<br>· Over a year ago?   · Between three months and a year ago?   · Within the last three months? | | |

| **CCS** CORRECT CARE SOLUTIONS | **Suicide Watch Initial Assessment** | Patient Name (Last, First, MI): |
|---|---|---|
| Date of Birth:        Status: ☐ Adult ☐Juvenile | Patient ID No: | Date: |

| **Type of Watch and Frequency** | **Date placed on watch** |
|---|---|
| ☐ Constant  ☐ Staggered 15 minutes<br>☐ Other, indicate watch frequency _____ | _____ **Number of Days on Watch** _____<br>**Time placed on Watch** _____ |

| **Reason For Watch** | **Placed on watch by** |
|---|---|
| ☐ Ideation/Threat    ☐ Plan    ☐ Act<br>☐Other_____ | ☐ Behavioral Health ☐ Nursing  ☐ Medical provider<br>☐ Security          ☐ Psychiatric Provider |

**Events Leading to Suicide/Self-Harm Watch (include patient's report as well as the official records of the event)**

_____
_____
_____
_____
_____
_____
_____
_____

## Mental Status Examination

| Appearance | Speech | Mood | Affect | Thought Form | Thought Content |
|---|---|---|---|---|---|
| ☐Appropriate<br>☐Meticulous<br>☐Unclean<br>☐Disheveled<br>☐Bizarre<br>☐Other_____ | ☐Appropriate<br>☐Expressive<br>☐Loud<br>☐Slowed<br>☐Pressured<br>☐Slurred<br>☐Other_____ | ☐Appropriate<br>☐Depressed<br>☐Euphoric<br>☐Anxious<br>☐Angry<br>☐Irritable<br>☐Other_____ | ☐Appropriate<br>☐Tearful<br>☐Blunted<br>☐Flat<br>☐Labile<br>☐Hostile<br>☐Other_____ | ☐Coherent<br>☐Circumstantial<br>☐Tangential<br>☐Loose Assoc.<br>☐Poverty of Thought<br>☐Flight of Ideas<br>☐Other_____ | ☐Appropriate<br>☐Hallucinations<br>☐Complobsess.<br>☐Thought insertion<br>☐Broadcasting<br>☐Delusional<br>☐Suicidal<br>☐Homicidal<br>☐Other |
| **Orientated to**<br>☐Person<br>☐Place<br>☐Time<br>☐Situation | **Intelligence**<br>☐Above Average<br>☐Average<br>☐Below Average<br>☐Well Below Average | **Memory**<br>☐Intact<br>☐Immediate Impaired<br>☐Recent Impaired<br>☐Remote Impaired | **Insight**<br>☐Intact<br>☐Good<br>☐Fair<br>☐Poor | **Judgment**<br>☐Intact<br>☐Good<br>☐Fair<br>☐Poor | **Behavior**<br>☐Appropriate<br>☐Belligerent<br>☐Agitated<br>☐Impulsive<br>☐Withdrawn<br>☐Other_____ |

## Current Status

| **Medication Compliant?**<br>☐ N/A     ☐ Yes       ☐ No | **Current Suicidal Ideations?**<br>☐ Yes  ☐ No    ☐ Refuses to answer | **Current Homicidal Ideations?**<br>☐ Yes  ☐ No    ☐ Refuses to answer |
|---|---|---|
| **Estimated current self-harm/ suicide risk level**<br>☐ Low  ☐ Intermediate  ☐ High | Date of last self-harm incident:<br>_____ | Behaviors of Concern: |

| **△CCS** CORRECT CARE SOLUTIONS | **Suicide Watch Initial Assessment** | Patient Name (Last, First, MI): |
|---|---|---|
| Date of Birth: | Status: ☐ Adult ☐Juvenile | Patient ID No: | Date: |

## Treatment Goals (check all that apply)

☐ Decrease/eliminate self-injurious behaviors

☐ Decrease risk level as evidenced by _____

☐ Eliminate self-harm/self-harm statements

☐ Improve medication compliance

☐ Other (describe) _____

### Risk Factors

| ☐ Hopelessness, feelings of guilt or worthlessness | ☐ Impulsive | ☐ Major Depressive/ manic episode | ☐ 1st incarceration or arrest | ☐ Prior suicide attempts or suicide note found |
|---|---|---|---|---|
| ☐ New legal issues (new charges, newly sentenced, lengthy sentence, denied parole) | ☐ Bad news (loss of loved one, visit cancelled or no show, privileges revoked, serious illness, recent rejection or loss) | | ☐ Placement in segregation/isolation | ☐ Family history of suicide attempts |
| ☐ Intoxicated or detoxing from alcohol/ other drugs | ☐ Humiliating events/rejection (sexual assault) | | ☐ High profile crime (media attention) | ☐ Anniversary of important loss |
| ☐ Prior suicide watch placement in jail | ☐ Recent release from psychiatric hospital | | ☐ Reports of giving items away | ☐ Other (describe): _____ |

### Protective Factors

| ☐ Identifies reason for living | ☐ Fear of death or dying due to pain and suffering | ☐ Responsibility to family or others; living with family | ☐ Belief that suicide is immoral; high spirituality |
|---|---|---|---|
| ☐ Supportive social network of family | ☐ Engaged in work or school | | ☐ Other (describe):_____ |

## Plan (check all that apply)

☐ Follow up daily while on watch

☐ Discharge from watch, follow up within 7 days

☐ Property allowed (PROPERTY ONLY ALLOWED IF CHECKED)

Clothing:      ☐ Safety blanket  ☐ Safety smock   ☐ Paper Gown    ☐ Regular uniform    ☐ Other _____
Food:          ☐ Finger foods    ☐ Regular Tray   ☐ Other _____
Other:         ☐ Book            ☐ Glasses
☐ Hygiene items (Specify) _____                                          ☐ Other _____

| Consultation: ☐ ☐ | Not indicated Consultation with _____ |
|---|---|

☐ Refer to  ☐ Psychiatry        ☐ Medical   ☐ Special Needs       ☐ Other_____

| Signature | Title | Time |
|---|---|---|

Form Number:  BH218UN0000ACCEN070717                                          Page 3 of 3

Nevertheless, irrespective of what information was on that form, if it in fact exists, Ms. Oliver had been provided more than sufficient information to indicate to her that Eli needed to be isolated, without the ability to harm himself, for further mental health evaluation or, in the alternative, immediately transferred off-site to an in-patient mental health rehabilitation facility.  Her decision caused and proximately caused Eli's death.

56.     It is difficult to imagine a more extensive set of facts listed in prisoner intake forms that would put a jail and its employees on notice that a person should not be incarcerated but instead immediately taken to and admitted in an appropriate mental health facility.  Regardless, Ms. Oliver chose to release Eli into the general jail population without restrictions.  This decision was known to her to likely cause Eli's death, and it in fact resulted in that unfortunate occurrence.

57.     After Eli committed suicide, jail officer Mark Alcozar signed a typed statement.  In that statement, he wrote, "Mental Health Oliver spoke with inmate Gauna and cleared him from a 15 minute mental health check and stated he was OK.  I had inmate Gauna fill the inmate visitor list and told him to fill out the prea [Prison Rape Elimination Act] inmate questionnaire."  Moreover, upon information and belief, after Ms. Oliver determined that Eli could be placed into the general jail population, contrary to LVN Cunningham's prior determination that he should be on suicide watch, LVN Cunningham completed a form indicating that Eli had been "approved for general population" in the "central jail."

BELL COUNTY LAW ENFORCEMENT CENTER
MEDICAL CLEARANCE CHECK SHEET

INMATE NAME: Gauna, Eli                    DATE/TIME: 12-30-17    8815

BOOKING #: 11331

☑ PPD ADMINISTERED

☑ APPROVED FOR GENERAL POPULATION

☑ CLEARED FOR CENTRAL JAIL

☐ NEEDS HOUSED IN INFIRMARY FOR MEDICAL/MENTAL HEALTH OBSERVATION

☐ ADDITIONAL COMMENTS:

NURSE SIGNATURE: Cunningham LVN

58.    Texas Commission on Jail Standards records regarding Eli's death contain the following written notation:  "Inspector Benningfield spoke with JA Shelton 03/27/18.  JA Shelton to meet w/ MH.  Plan of action developed, and includes discussion with security staff decisions to remove inmates from suicide watch."  Texas Commission on Jail Standards records also indicate that Eli had only been placed on suicide observation for approximately the first three hours after arriving at the jail (at approximately 7:08 a.m.).  This demonstrated jailers' reliance on, and their actions in response to, Ms. Oliver's determination that Eli would be placed into the general jail population.

2.      Eli's Suicide

59.      According to Texas Commission on Jail Standard records, on January 1, 2018, at approximately 9:29 a.m., Eli was sitting at a table in his cell block with other inmates.  A little over 20 minutes later, Eli was served his meal tray and was eating.  Trays were then picked up, and inner cell doors were opened.  Eli was observed going into his individual cell.  Lights were turned off at approximately 10:08 a.m.  At approximately 10:27 a.m. movement could be seen in Eli's cell.  He was attempting to throw his sheet over something high in his cell.  Shortly thereafter, Eli made his first attempt to commit suicide by hanging, with both feet flat on the floor and one end of the sheet tied around his neck (while the other end was secured to something unseen in the video recording).  At approximately 10:30 a.m. Eli stepped up onto something in the cell and out of camera range, and he made his second suicide attempt at 10:32 a.m.

60.      At approximately 10:43 a.m., video showed one or more other inmates realizing that something was wrong.  Shortly thereafter, officers entered Eli's cell. Unfortunately, it was too late for Eli.  He had suffered irreparable physical injuries from which he would not recover.

61.      Eli had hung himself with, upon information and belief, a bed sheet.  Upon information and belief, the area in which Eli was incarcerated was not an area in which precautions were taken for suicidal inmates, but rather one in which items such as the bed sheet were readily available to inmates intending to commit suicide.  Moreover, it was fairly easy for Eli, as it would have been for anyone in that portion of the jail, to find a point at which he could tie off the bed sheet such that it could be used as a noose.

62.      Eli was treated by EMS personnel and ultimately transported to Baylor Scott & White Hospital.  Eli remained at the hospital, receiving care, until he was removed from life

support care on February 4, 2018.  Justice of the peace David Barfield made the determination that no autopsy of Eli would be conducted.

63.     Eli left a suicide note in his cell, as further unfortunate evidence of his plan which any person conducting an intake, as did Ms. Oliver, would have known.  The note read in part, "I'm so sorry for everything I have done."  Eli listed phone numbers for his brother and his mother.

64.     The death certificate for Eli indicated that Eli's death occurred on February 4, 2018, which was listed as being 35 days after suffering respiratory failure from hanging.  The certificate indicated as causes of death respiratory failure, asphyxia, and hanging by ligature.  Thus, the death certificate reflected the fact that Eli was hospitalized for over a month after his suicide attempt.

### 3.     Bell County's Post-Death Reporting of False Information

65.     Bell County was required by law to file a custodial death report with the Attorney General of Texas no later than 30 days after Eli's death.  Bell County did so.  The form listed various details regarding Eli and his death, including that Eli committed suicide.  The form indicated that the event causing Eli's death occurred at 113 W. Central Avenue in Belton.  The form also had the "Yes" box checked, in response to the question, "Make suicidal statements?"

66.     However, in response to the question, "Exhibit any mental health problems," the "No" box was checked.  This was clearly false information provided to the Attorney General regarding Eli's condition.  Eli exhibited significant mental health problems, and surely Bell County Captain Byron Shelton, who is listed as completing the report, would have known as much when he completed it on February 5, 2018 – over a month after Eli's suicide attempt.  By that time, upon information and belief, the jail had conducted an investigation which would have informed Captain Shelton – and all other high-level employees connected with the Bell County jail – of Eli's significant mental health issues.

### 4.    Jail Suicides Are a Widespread Problem

#### a)    Common Knowledge

67.    Jail suicides, as Defendants knew before incarcerating Eli, are a huge problem in the United States.  One-thousand fifty-three (1,053) people died in local jails in 2014, three-hundred seventy-two (372) of which died as a result of suicide.  Defendants also knew when incarcerating Eli that most jail suicides occur by hanging/strangulation, with prisoners using objects available to them as ligatures.  Prisoners commonly use bed linens, clothing (including drawstrings), telephone cords, and trash bags.

68.    The Texas Commission on Jail Standards ("TCJS") specifies use of a screening form for suicide and medical/mental/developmental impairments.  The screening form was revised before Eli was incarcerated to achieve, as one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line jail personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake screening "is the first step and is crucial to determine which inmates require more specialized mental health assessment."  Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."

69.    The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders.  The TCJS requires that an intake screening form be completed for all prisoners immediately upon admission into a jail facility.  Further, staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the

inmate's incarceration.  A jail must maintain any such additional screening forms in a prisoner's file.

70.     Suicides were not a novel occurrence and/or unknown issue to Defendants.  They were well-aware of the risk – and in Eli's case the certainty – of suicide.  They were deliberately indifferent to this certainty, and Eli died as a result.  The natural person Defendant acted in an objectively unreasonable manner, and Bell County's and CHC's policies, practices, and/or customs were moving forces behind Eli's death.

b)     Fifth Circuit's Long-Held Constitutional Standard:   Continuous Observation and Monitoring

71.     Nearly 30 years ago, in November 1991, the Texas Commission on Jail Standards published the Guide for Development of Suicide Prevention Plans.  Even that long ago, when society and medical professionals as a whole knew much less than they have learned over the last few years, the Commission recommended continuous observation for high risk, acutely suicidal inmates who had attempted suicide.  Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 30 years ago (in 1992), unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit (Texas, Louisiana, and Mississippi), regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care.  **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**

**What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to** *deliberate* **indifference.**

*Id.* at 395-96 (emphasis added).

The Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution. The law was clearly established with exacting specificity, and Defendants were charged with knowledge of it.

### 5.   Ms. Oliver's Background and Education

72.   Ms. Oliver was at the time she conducted a purported evaluation of Eli at the Bell County jail a licensed clinical social worker. Upon information and belief, her background, education, training, and experience taught her things which clearly indicated to her, when she interacted with Eli when determining whether to isolate him as a suicidal inmate or release him into the general jail population, that she was being deliberately indifferent and/or objectively unreasonable in making her ultimate mental health determinations regarding Eli. A licensed

clinical social worker ("LCSW") is a social worker who is involved with the mental health counseling branch of social work.  An LCSW can provide mental health therapy to a person with mental health needs.  Further, an LCSW can assess such needs through conducting an inventory.  An LCSW is also, upon information and belief, trained to look for signs of suicidal ideation and the likelihood that a person will harm himself or herself, up to and including through suicide.

73.    Ms. Oliver had been for a lengthy period of time an adjunct professor at McLennan County Community College.  She also worked as a behavioral therapist for Senior Gateway, DePaul Center.  She had also served as adjunct professor at Baylor University, where she earned a master's degree in gerontology in year 2000.  Ms. Oliver also served as adjunct faculty at University of Mary Hardin-Baylor, in the Social Work, Sociology and Criminal Justice Department.

### E.    *Monell* Liability of Bell County and CHC

74.    Plaintiff sets forth in this section of the pleading additional facts supporting *Monell* liability claims against Bell County and CHC.  It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of Bell County and CHC support such *Monell* liability claims, and not just facts set forth in this section.  Such policies, practices, and customs alleged in this pleading were moving forces behind and proximately caused the constitutional violations and damages asserted herein.

### 1.    Bell County and CHC Admit That Their Policies, Practices, and/or Customs, When Eli Committed Suicide, Were Insufficient

75.    Bell County and CHC recognize that their policies, procedures, and/or customs at the time Eli committed suicide were insufficient to provide constitutional protection to people like Eli.  As a result, Stacey Tennison McClinton, Sergeant of Intake Support for Bell County, drafted

an email to Jackie Benningfield, an inspector with the Texas Commission on Jail Standards.  That

email set forth an "action plan" that should be followed after Eli's death:

**Wendy Wisneski**

| | |
|---|---|
| From: | Jackie Benningfield |
| Sent: | Monday, April 30, 2018 11:43 AM |
| To: | Wendy Wisneski |
| Subject: | FW: Guana action plan |
| Attachments: | Mental Health Screening form.pdf; Medical -Mental health Check sheet.pdf; Mental Health evaluation .pdf |

Wendy:

I spoke with Captain Shelton on 3/27/2018 and advised that they need to sit down and discuss this situation with their mental health provider. Below is the result of this meeting.

**From:** Stacey A. Tennison [mailto:Stacey.Tennison@bellcounty.texas.gov]
**Sent:** Friday, April 20, 2018 11:07 AM
**To:** Jackie Benningfield <jackie.benningfield@tcjs.state.tx.us>
**Subject:** Guana action plan

Hi Jackie,

We have sat down as a team to come up with an action plan in hopes to prevent any future incident.

Attached is the Jail Standards Mental Health Screening Form.
- We have added a box at the bottom to clarify if the inmate was placed on Suicide Watch or Constant Watch
- Upon intake, medical will check their system to see if inmate was place on Watch during previous in custody
- If yes, inmate will be place on Watch even if MH screening form is all no and doesn't indicate check is needed.
- If no previous history, check will be placed according to MH Screening form

Attached is a Medical/Mental Health Check sheet (MH Screening Form is attached to this form for Medical and Mental Health to review)
- Top Portion of the form will be filled out by medical from outcome of Intake
- When form is completed by medical it will be given to Intake Supervisor
- Intake Supervisor will review to see if Medical placed Inmate on Check
- If yes and inmate is not on check, a check will be started immediately
- If no, supervisor will pass form to Classification so Inmate can be housed.
- If form is yes it will be held by supervisor and then passed to Mental Health so they can visit with inmate.
- Mental Health will complete bottom portion of form with outcome of Mental Health evaluation with inmate.
- Mental Health will discuss with Supervisor recommendations

Attached Mental Health Evaluation
- Mental Health will complete form on all Inmates on check.
- First page of form will be reviewed by Mental Health and Supervisor.

After this process is complete Mental Health and Supervisor will discuss action plan. If supervisor doesn't agree with Mental Health, the supervisor will make a decision to go UP in care.

Let me know if you need further explanation to anything mentioned above.

1

*Stacey (Tennison) McClinton*
*Sergeant, Intake Support*
*System Administrator*
Phone: 254-933-5450

Fax: 254-933-5939
Stacey.Tennison@bellcounty.texas.gov

2

2.      Bell County's and CHC's Unwritten Policies, Practices, and/or Customs
Were Moving Forces Behind and Caused Eli's Death

76.     Upon information and belief, Bell County and CHC had unwritten policies,

practices, and/or customs which were used and applied by Ms. Oliver when she dealt with and

made decisions about Eli referenced in this pleading.  Evidence of such is, upon information and

belief, the fact that CHC chose not to terminate Ms. Oliver, and Bell County chose not to exercise

its contractual right to insist that Ms. Oliver no longer work at and/or provide care at any Bell

County jail.  This is not an assertion that CHC and Bell County ratified Ms. Oliver's actions, and

that such ratification alone gives rise to a cause of action.  Rather, it is an assertion that *de facto*

ratification of Ms. Oliver's actions, evidenced by not terminating her, showed approval for

apparent unwritten policies, practices, and/or customs which Ms. Oliver followed when dealing

with Eli.  These apparent unwritten policies, practices, and/or customs were, upon information and

belief, moving forces behind and proximately caused Eli's death and constitutional violations and

other damages asserted in this pleading.

77.     Public Information Act requests, regarding issues in this case, were made pre-suit

to several governmental agencies and/or political subdivisions, including Bell County, the Texas

Commission on Jail Standards, and the Texas Department of Public Safety (who investigates

through the Texas Rangers deaths such as those at issue in this case).  Upon information and belief,

no written statement of Ms. Oliver which appears to have been made after Eli's death, and for the

purpose of further documenting what occurred in her interaction with Eli, was received in

response.  Thus, upon information and belief, no such written statement exists.  The fact that no

such statement was obtained from Ms. Oliver by Bell County and/or CHC is some evidence of

Bell County's and CHC's policies, practices, and customs being followed by Ms. Oliver and which

led to Eli's death.  If Bell County and CHC were concerned that Ms. Oliver had not followed existing policies, practices, and/or customs, they certainly would have required Ms. Oliver to complete a detailed statement regarding all of her interaction with Eli and decisions she made in response.

> 3.  Bell County's and CHC's Policies, Practices, and/or Customs Regarding Understaffing the Jail on Weekends were Moving Forces Behind and Caused Eli's Death

78.    Upon information and belief, and as elsewhere asserted in this pleading, Bell County and CHC had a policy of staffing the jail at which Eli was incarcerated with fewer appropriate staff members on weekends and, presumably even more so, on holiday weekends (such as the holiday weekend Eli made his successful suicide attempt).  Upon information and belief, those policies included not having on staff on weekends a psychiatrist or other appropriate mental health person who could assure that decisions made by social workers, such as Ms. Oliver, were appropriate for seriously mental ill people such as Eli.  This policy and decision which was, upon information and belief, made by the relevant chief policymaker, constituted deliberate indifference to the likely effects of such a policy – that people would die as a result of self-harm.  Such a policy would also be patently unreasonable in light of Fifth Circuit precedent and the reality that inmates need mental health care seven days each week, 365 days each year.  Upon information and belief, these policies were moving forces behind and proximately caused Eli's death.

> 4.  Bell County's and CHC's Policy, Practice, and/or Custom of Staffing the Jail with only a Lower-Level Mental Health Worker was a Moving Force Behind and Caused Eli's Death

79.    Upon information and belief, Bell County and CHC had a policy of staffing the jail at which Eli was initially incarcerated with mental health workers at a level no higher than a social worker.  The jail should have been staffed at all times with a psychiatrist, as is evidenced by the

need for a psychiatrist at the jail and referenced in the contract between Bell County and CHC. Bell County's and CHC's policy of allowing only Ms. Oliver to make an evaluation of, and ultimate decisions about, Eli was, upon information and belief, a proximate cause and moving force behind Eli's death.  The policy, practice, and/or custom should have required a psychiatrist to "sign off" on allowing someone with Eli's mental health history to be released into the general jail population.  This requirement is particularly evident, considering that an LVN realized that Eli should have been put on suicide watch.  This policy, practice, and/or custom also constituted deliberate indifference to the likely outcome – suicidal prisoners being released into the general jail population, into areas in which tangible items were available to be used to commit suicide, when they should be placed on continuous observation.

> 5.     Bell County's and CHC's Policy, Practice, and/or Custom of Gutting Healthcare and Mental Healthcare Costs was a Moving Force Behind and Caused Eli's Death

80.     Upon information and belief, Bell County and CHC had a partially written and substantially unwritten policy, practice, and/or custom of not transferring Bell County prisoners to an appropriate offsite facility, even when such prisoners had serious need for such a transfer, merely to cut costs.  This policy was not a rudimentary attempt to cut costs, but instead an attempt to slash costs for such offsite treatment to virtually nothing.  Eli needed either constant monitoring while at the jail, which was not provided, or to be transferred to an offsite facility for significant mental health evaluation and treatment.  Bell County's and CHC's policy, practice, and/or custom of not doing so, upon information and belief, led to, was a proximate cause of, and was a moving force behind Eli's death.  Further, this policy was deliberate indifference to the mental health needs of people such as Eli, because any chief policymaker formulating the policy, practice, and/or

custom would have known with a certainty that certain prisoners need offsite care to avoid committing suicide.

81.     Exhibit B to the above-referenced contract between Bell County and CHC includes a reference to CHC's utilization management program for offsite services.  CHC notes that its implementation of such a program helped Bell County with "costs containment."  CHC describes its "aggressive" utilization management review, which allowed it to "restrict the use of expensive offsite resources to only those treatments and procedures which [CHC contends] are medically indicated."  CHC touts the fact that it reduced Bell County offsite medical services spending from $590,525.19 in 2008 to only $17,465.02 in 2010 (a reduction of over 97%).  It is difficult to imagine how any company could decrease a nearly $600,000.00 amount for offsite services to an amount less than $20,000.00, with a significantly growing population in the Bell County region of the State, unless CHC, and consequently Bell County, was deliberately indifferent to medical and/or mental health care needs of Bell County prisoners.  Upon information and belief, that is in fact what was occurring.  Further, evidence is that the total base amount to be paid by Bell County to CHC for services including pharmacy had increased several hundred thousand dollars from the time the original contract was signed, until the fifth amendment to the contract was signed (such amendment being effective January 13, 2018).

82.     Likewise, CHC touted in Exhibit B its ability to significantly limit expenditures for its staff working in Bell County jails.  However, upon information and belief, this was in practice deliberate indifference to the medical and mental health care needs of prisoners, especially considered in light of the fact that agreed staffing on weekends was insufficient, not only standing alone, but especially as compared against agreed staffing between Bell County and CHC to occur at Bell County jails on weekdays.

III.     Causes of Action

   A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective
          Reasonableness Pursuant to *Kingsley v. Hendrickson*

83.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several

jail officers alleging that they violated the 14th Amendment's Due Process Clause by using

excessive force against him.   *Id*. at 2470.   The Court was determining the following issue:

"whether, to prove an excessive force claim, a pretrial detainee must show that the officers were

*subjectively* aware that their use of force was unreasonable, or only that the officer's use of that

force was *objectively* unreasonable." *Id.* (emphasis in original).   The United States Supreme Court

concluded that only the objectively unreasonable standard was the correct standard to be used in

excessive force cases, and that the officer's subjective awareness was irrelevant.   *Id.*   The Court

did so, acknowledging and resolving disagreement among the Circuits.   *Id.* at 2471-72.

84.     The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff

is required to prove."   *Id.* at 2472.   Instead, "courts must use an objective standard."   *Id* at 2472-

73.   "[A] pretrial detainee must show only that the force purposefully or knowingly used against

him was objectively unreasonable."   *Id.* at 2473.   Thus, the Court required no *mens rea*, no

conscious violation, and no subjective belief or understanding of the offending police officers for

an episodic claim but instead instructed all federal courts to analyze officers' conduct on an

objective reasonability basis.   There is no reason to treat pretrial detainees' other rights arising

under the 14th Amendment's due process clause – such as the right to receive reasonable medical

and mental health care, the right to be protected from harm, and the right not to be punished –

differently.

85.     It appears that this standard is now the law of the land.   In *Alderson v. Concordia

Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered

appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure

to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983.  *Id.* at 418.  The court

wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment."

*Id.* at 419 (citation omitted).  The Fifth Circuit determined, even though *Kingsley* had been decided

by the United States Supreme Court, that a plaintiff in such a case still must show subjective

deliberate indifference by a defendant in an episodic act or omission case.  *Id.* at 419-20.  A plaintiff

must still show that actions of such an individual person acting under color of state law were

"reckless."  *Id.* at 420 (citation omitted).  However, concurring Circuit Judge Graves dissented to

a footnote in which the majority refused to reconsider the deliberate indifference, subjective

standard, in the Fifth Circuit.  *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, ⸺ U.S. ⸺, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).  In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley."  *Kingsley*, 135 S.Ct. at 2472.  However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*.  Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners.  We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476.  This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

86.     The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*.  First, the panel was bound by the Fifth Circuit's "rule of orderliness."  *Id.* at 420 n.4.  Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims.  *Id.*  Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*.  *Id.*  Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases.  *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

87.     Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court

---

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees."  *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015).  The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*.  Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*.  *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016).  Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

     B.    <u>Cause of Action Against Natalee G. Oliver Under 42 U.S.C. § 1983 for Violation of Eli Gauna's 14th Amendment Due Process Rights to Reasonable Medical and Mental Health Care, to be Protected, and Not to Be Punished as a Pretrial Detainee</u>

88.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Natalee G. Oliver is liable to Plaintiff (including Ms. Sanchez and all other heirs at law, including Eli Gauna, Sr.), pursuant to 42 U.S.C. § 1983, for violating Eli's rights to reasonable medical and mental health care, to be protected from himself and others, and not to be punished as a pretrial detainee, such rights guaranteed by the 14th Amendment to the United States Constitution.  Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  Pre-trial detainees are also entitled to protection from themselves and others, and not to be punished at all since they have not been convicted of any crime resulting in their incarceration.

89.    Ms. Oliver acted and failed to act under color of state law at all times referenced in this pleading.  Ms. Oliver wholly or substantially ignored Eli's suicidal and self-harm tendencies and his obvious serious medical and mental health needs, and she was deliberately indifferent to those needs.  Ms. Oliver chose to allow Eli to harm himself, and thus failed to protect him, and further punished Eli by, among potentially other things, not placing him into a single-occupancy cell with suicide–preventive materials for continuous observation, and allowing him to kill himself.  Ms. Oliver was not just aware, but very much aware, of Eli's serious psychological and

medical issues and tendencies to harm himself.  She gained this knowledge as described in the Factual Allegations section above.  Thus, Ms. Oliver had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk.  She was aware of the excessive risk to Eli's health or safety and was aware of facts from which an inference could be drawn of serious harm (and she in fact drew that inference).  In fact, based on what occurred, it was more than an inference to Ms. Oliver.  It was blatantly apparent to Ms. Oliver that, unless she protected Eli and provided him needed medical and/or psychological care, he would kill himself.

90.     Ms. Oliver violated clearly established constitutional rights, and her conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Eli, as a pretrial detainee, had a clearly established right to receive reasonable medical and mental health care, to be protected from himself and others, and not to be punished.  These rights included the right to be continuously and appropriately monitored.  These rights also included the right to have removed from Eli's cell items commonly known to be used by suicidal inmates to kill themselves (such as the bed sheet).

91.     In the alternative, Ms. Oliver's deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of the constitutional violations set forth in this section of this pleading.  The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470-71.  Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, all flow from the 14th Amendment's due process clause.  *Id*.  Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations should be identical.

92.     Ms. Oliver is not entitled to qualified immunity.[2]  Her denial of reasonable medical and mental health care, her refusal to put Eli into a single cell as he requested and in accordance with Bell County/CHC policy, her decision to put Eli into the general jail population in a portion of the jail which Ms. Oliver knew would contain items with which Eli could kill himself, her total disregard for Eli's health and safety, and/or her total disregard for Eli's suicidal tendencies and propensity to hurt himself caused, proximately caused, and were producing causes of Eli's death and other damages suffered by Eli, Ms. Sanchez, and Eli's heirs-at-law (including Eli Gauna, Sr.) (asserted by Kathy Sanchez as Dependent Administrator of the Estate of Eli Gauna Jr.).

93.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Eli's heirs-at-law, including Ms. Sanchez and Eli Gauna, Sr., and

---

[2]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws.  However, the qualified immunity defense was invented by judges.  Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

The natural person Defendant cannot show that she would fall within the category of persons referenced in the first sentence of this footnote.  This would be Defendant's burden, if she chooses to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99.  Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

the Estate of Eli Gauna Jr., seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting caselaw.  If Eli had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.  Therefore, Eli's estate and/or his heirs at law suffered the following damages, for which they seek recovery from Ms. Oliver:

- Eli's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- Eli's medical expenses;

- Eli's funeral expenses;  and

- exemplary/punitive damages.

94.     These heirs-at-law (including Ms. Sanchez and Eli Gauna, Sr.) also individually seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations.  Ms. Sanchez and Eli Gauna, Sr. seek those damages due to the wrongful death of their biological and legal son.  The damages suffered by the heirs-at-law were caused and/or proximately caused by Ms. Oliver.  Therefore, Ms. Oliver's actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by Ms. Sanchez, and Eli Gauna, Sr., for which they individually seek compensation:

- loss of services that Ms. Sanchez and Eli Gauna, Sr. would have received from their son, Eli;

- expenses for Eli's funeral;

- past mental anguish and emotional distress suffered by Ms. Sanchez and Eli Gauna, Sr. resulting from and caused by the death of Eli;

- future mental anguish and emotional distress suffered by Ms. Sanchez and Eli Gauna, Sr. resulting from and caused by the death of Eli;

- loss of companionship and society that Ms. Sanchez and Eli Gauna, Sr. would have received from Eli; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Eli's constitutional rights.  Ms. Oliver's actions and inaction showed a reckless or callous disregard of, or indifference to, Eli's rights and safety.  Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

C.     Cause of Action Against Bell County and CHC Under 42 U.S.C. § 1983 for Violation of Eli Gauna's 14th Amendment Due Process Rights as a Pretrial Detainee to Reasonable Medical and Mental Health Care, to be Protected, and Not to be Punished

95.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Bell County and CHC are liable to Plaintiff (including Ms. Sanchez and Eli Gauna, Sr.), pursuant to 42 U.S.C. § 1983, for violating Eli's rights to reasonable medical and mental health care, to be protected from himself and others, and not to be punished as a pre-trial detainee, such rights guaranteed by the Fourteenth Amendment to the United States Constitution.  According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers.  Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for an official policy or practice Section 1983 claim is objective.  Such an objective standard comports with *Kingsley v.*

*Hendrickson* 135 S.Ct. 2466 (2015).

96.     Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  They are also entitled to be protected from themselves and others and not to be punished at all, since they have not been convicted of any crime resulting in their incarceration.  Bell County and CHC acted or failed to act under color of state law at all relevant times.  Bell County's and CHC's policies, practices, and/or custom were moving forces behind and proximately caused Eli's death and Plaintiff's (including Ms. Sanchez's and Eli Gauna, Sr.'s) resulting damages.

97.     The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the Sheriff of Bell County was the relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the jail administrator was the relevant chief policymaker over matters at issue in this case.  Bell County and CHC were deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to Bell County prisoners with serious medical and mental health issues, and self-harm and suicidal tendencies, as evidenced by allegations set forth in the Factual Allegations section above.  Bell County and CHC acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced in that section, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Eli's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.  Bell County's and CHC's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Eli and those similarly situated.

98.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to

42 U.S.C. § 1983.  Therefore, Eli's heirs-at-law, including Ms. Sanchez and Eli Gauna, Sr., and the Estate of Eli Gauna Jr., seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting caselaw.  If Eli had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.  Therefore, Eli's estate and/or his heirs at law suffered the following damages, for which they seek recovery from Bell County and CHC (jointly and severally):

- Eli's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- Eli's medical expenses; and

- Eli's funeral expenses.

99.     These heirs-at-law (including Ms. Sanchez and Eli Gauna, Sr.) also, individually, seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations.  Ms. Sanchez and Eli Gauna, Sr. seek those damages due to the wrongful death of their biological and legal son.  The damages suffered by the heirs-at-law were caused and/or proximately caused by Bell County and CHC.  Therefore, Bell County's and CHC's actions caused, were proximate and/or producing causes of the following damages suffered by Ms. Sanchez and Eli Gauna, Sr., for which they individually seek compensation:

- loss of services that Ms. Sanchez and Eli Gauna, Sr. would have received from their son, Eli;

- expenses for Eli's funeral;

- past mental anguish and emotional distress suffered by Ms. Sanchez and Eli Gauna, Sr. resulting from and caused by the death of Eli;

- future mental anguish and emotional distress suffered by Ms. Sanchez and Eli Gauna, Sr. resulting from and caused by the death of Eli; and

- loss of companionship and society that Ms. Sanchez and Eli Gauna, Sr. would have received from Eli.

Moreover, Plaintiff (including Kathy Sanchez and Eli Gauna, Sr.) seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

D.      Causes of Action Against Bell County for Violation of Americans with Disabilities Act and Rehabilitation Act

100.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Bell County is liable to Plaintiff (and Eli's heirs-at-law) pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.  Bell County is liable whether it was Bell County employees and/or agents who violated the ADA and/or Rehabilitation Act or, in the alternative, CHC employees and/or agents who violated the ADA and/or Rehabilitation Act.  Upon information and belief, Bell County has been and is a recipient of federal funds.  Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose.  Further, Title II of the ADA applies to Bell County and has the same mandate as the Rehabilitation Act.  Claims under both the Rehabilitation Act and ADA are analyzed similarly.

101.    The Bell County jail is a "facility" for purposes of both the rehabilitation and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA

purposes.  Eli was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of his major life activities.  Eli was therefore disabled.  Upon information and belief, Eli was also discriminated against by reason of his disability.

102.    A majority of circuits have held, for purposes of Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate indifference.  The Fifth Circuit has, as yet, declined to follow the majority view.  Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

103.    Bell County's and/or CHC's failure and refusal to accommodate Eli's mental disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Eli's death and Plaintiff's (including all heirs-at-law, including Eli Gauna Sr.'s) damages.

104.    Bell County's and/or CHC's violations of the Rehabilitation Act and the ADA included the failure to reasonably modify facilities, services, accommodations, and programs to reasonably accommodate Eli's mental disabilities.  These failures and refusals, which were intentional, proximately caused Eli's death and Plaintiff's (and Eli's heirs-at-law, including Eli Gauna, Sr.'s) damages.  Because Eli's death resulted from Bell County's and/or CHC's intentional discrimination against him, Plaintiff (including all heirs-at-law, including Eli Gauna Sr.) are entitled to the maximum amount of compensatory damages allowed by law.  Plaintiff (and Eli's heirs-at-law, including Eli Gauna, Sr.) seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of Plaintiff's (and Eli's heirs-at-law, including Eli Gauna, Sr.'s) 42 U.S.C. § 1983 claims and resulting damages) to

the extent allowed by the Rehabilitation Act and the ADA, and Plaintiff also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

## IV.      Concluding Allegations and Prayer

### A.      Conditions Precedent

105.   All conditions precedent to assertion of Plaintiff's claims have occurred.

### B.      Use of Documents at Trial or Pretrial Proceedings

106.   Plaintiff intends to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

### C.      Jury Demand

107.   Plaintiff demands a jury trial on all issues which may be tried to a jury.

### D.      Prayer

108.   For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff (and Eli's heirs at law, including Eli Gauna, Sr.) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally applicable, for:

> a)      actual damages of and for Kathy R. Sanchez individually including but not necessarily limited to the following:
>
> •      loss of services that she would have received from her son, Eli;
>
> •      expenses for Eli's funeral;
>
> •      past mental anguish and emotional distress resulting from and

caused by the death of Eli;

- future mental anguish and emotional distress resulting from and caused by the death of Eli; and

- loss of companionship and society that she would have received from Eli;

b)    actual damages of and for Eli Gauna, Sr. individually including but not necessarily limited to the following:

- loss of services that he would have received from his son, Eli;

- expenses for Eli's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of Eli;

- future mental anguish and emotional distress resulting from and caused by the death of Eli; and

- loss of companionship and society that he would have received from Eli;

c)    actual damages of and for the Estate of Eli Gauna through its Dependent Administrator Kathy Sanchez (ultimately the heirs-at-law of Eli, including Kathy Sanchez and Eli Gauna, Sr.) including but not necessarily limited to the following:

- Eli's conscious pain and suffering; and

- funeral expenses;

d)    exemplary/punitive damages for Plaintiff (including all heirs at law, including Kathy Sanchez and Eli Gauna, Sr.) from the natural person Defendant;

e)    reasonable and necessary attorneys' fees for Plaintiff (including all heirs at law, including Kathy Sanchez and Eli Gauna, Sr.) through trial and any

appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and

1988, the ADA, and the Rehabilitation Act;

f)      court costs and all other recoverable costs;

g)      prejudgment and postjudgment interest at the highest allowable rates;  and

h)      all other relief, legal and equitable, general and special, to which Plaintiff

(including all heirs at law, including Kathy Sanchez and Eli Gauna, Sr.) is

entitled.


Respectfully submitted,


_____/s/ T. Dean Malone_____
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Southern District of Texas Bar No. 37991
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:         (214) 670-9904
michael.oconnor@deanmalone.com